United States Court of Appeals,

Fifth Circuit.

No. 95-21023

Summary Calendar.

Robin Ray DODDY; Jeanette W. Doddy, Plaintiffs-Appellants,

v.

OXY USA, INC.; Occidental Petroleum Corporation; Petrolite Corporation; Treatolite-Petrolite Company; Treatolite Chemicals; Nalco Chemical Co., also known as Nalco Chemical Company Inc.; Bolt Fuel Oil Company Inc.; Pride Petroleum Services, also known as Pride Petroleum Services Inc.; Baker Hughes Incorporated, also known as Baker Hughes Incorporated; Baker Hughes Oil Field Operation Inc., formerly known as Baker Hughes Production Tools; Baker Performance Chemicals Inc.; Baker Performance Chemicals; Baker Performance Chemicals Incorporated; Pool Well Servicing, also known as Pool Company (Texas) Inc.; The Western Company, also known as Western Company of North America; Halliburton Company, also known as Halliburton Special Products, also known as Halliburton Services; Ancor Services Inc., also known as ASI Inc., also known as ASI; Billy Don Thomas, Individually and as Agent; Mark D. Johnson, Individually and as Agent; Paul Painter, Individually and as trustee; Central Title Company; Hart Engineering Company; Pool Well Servicing; Pool Company (Texas) Inc.; Halliburton Services; Halliburton Special Products; Pride Petroleum Services Inc., Defendants-Appellees,

Trident NGL Inc., Movant-Appellee.

Dec. 18, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS, EMILIO M. GARZA and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Plaintiffs Robin Ray Doddy and Jeanette W. Doddy sued a number of defendants[1] whom they claimed owned, operated, or maintained an active oil and gas well—the McKinley "E" Lease Well

---

[1]These defendants are Oxy USA, Inc. ("Oxy"); Occidental Petroleum Corp. ("Occidental"); Petrolite Corp., Tretolite-Petrolite Co. (which apparently does not exist), and Tretolite Chemicals ("Petrolite"); Baker Hughes, Inc., Baker Hughes Oilfield Operations, Inc., Baker Performance Chemicals, Inc. ("Baker"); Halliburton Co., Halliburton Services, Halliburton Special Products ("Halliburton"); Pool Well Servicing, and Pool Co. (Texas) Inc. ("Pool"); Nalco Chemical Co. ("Nalco"); Bolt Fuel Oil Co., Inc. ("Bolt"); Pride Petroleum Services, Inc. ("Pride"); The Western Co. ("Western"); Ancor Services, Inc. ("Ancor"); Central Title Co. ("Central"); Hart Engineering Co. ("Hart"); Trident NGL Inc. ("Trident"); Billy Don Thomas; Mark D. Johnson; and Paul Painter.

Fifteen of these defendants are respondents in this appeal: Oxy, Occidental, Petrolite, Baker, Halliburton, Pool, Nalco, Bolt, Pride, Western, Ancor, Central, Hart, Trident, and Painter. We term these 15 "the defendants."

No. 14 ("the well")—located near their home. The Doddys alleged that they had suffered property damage and personal injuries from toxic chemicals emanating from the well.

The district court disposed of all the claims against the defendants either through summary judgment or dismissal for lack of personal jurisdiction. The Doddys appeal the district court's denial of their motions to remand, its decision to strike portions of one of their affidavits, and its grant of motions for summary judgment or to dismiss made by the defendants. The Doddys also appeal the district court judge's decision to vacate her previous determination to recuse herself. We affirm.

## I

In 1983, the Doddys bought a home in the East Texas Oil Field. The house is near the well and various connecting pipes. The well was drilled in 1936, and the home was built by a developer in 1979.

After living in the house, the Doddys allegedly suffered various injuries and illnesses, including joint and muscle aches, sinus infections, coughing, and fatigue. They believed that these injuries and illnesses stemmed from toxic chemicals used in or generated by the well and its adjoining structures. The Doddys then filed a complaint in Texas state court against almost 30 defendants. Supposedly, these defendants included the owners and operators of the well, the companies that serviced the well, and the individuals responsible for developing and selling the home. The Doddys asserted claims of strict liability, negligence, gross negligence, and products liability.

Western removed the case to the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1452(a). Western was in bankruptcy proceedings at the time, and it maintained that the Doddys' action related to these proceedings. The Doddys then moved to remand, which motion the district court denied.

After the district court granted summary judgment to Western, the Doddys again moved to remand. They argued that the court now lacked subject matter jurisdiction over the lawsuit. The court denied the motion.

While this lawsuit was pending, Judge Harmon[2] was informed that defendant Nalco had

_____

[2]This case was initially assigned to Judge Rainey, who recused himself.

become affiliated with Exxon Corporation. Because Judge Harmon owned Exxon stock, she *sua sponte* recused herself, and the case was assigned to another judge. Later that day, though, she reconsidered her initial decision. She vacated the order of recusal, and scheduled an evidentiary hearing to determine the relationship of Nalco to Exxon. At the hearing, Nalco presented evidence that it had formed a new entity with Exxon to pursue a joint venture, but that neither Exxon nor this new entity would be affected by the litigation. Judge Harmon then referred the recusal issue to the chief judge of the district court. He concluded that there was no basis for recusal.

Both before and after the recusal proceedings, Judge Harmon granted the defendants' motions to dismiss and for summary judgment. Ultimately, all of the Doddys' claims were dismissed.

On appeal, the Doddys allege numerous errors below, which can be grouped as follows. First, they claim that the district court wrongly denied their two motions to remand. Second, they allege that the district judge erred by setting aside her recusal order once she had issued it. Third, they maintain that the district court should not have stricken parts of one of their affidavits. Fourth, they challenge the district court's grant of Occidental's motion to dismiss for lack of personal jurisdiction and its grant of summary judgment as to Central, Trident, Petrolite, Baker, Halliburton, Pool, Nalco, Bolt, Pride, Ancor, and Oxy.

## II

The Doddys contend that the district court should have granted their first motion to remand because their lawsuit was not a "core" proceeding under 28 U.S.C. § 157. We lack jurisdiction to hear their appeal.

Because Western was involved in Chapter 11 proceedings in federal bankruptcy court, it removed this action from state court pursuant to 28 U.S.C. § 1452. Section 1452 permits a party to remove a claim to federal district court if that court has jurisdiction over the claim under 28 U.S.C. § 1334. Section 1334 provides that federal district courts have original jurisdiction over all civil proceedings related to title 11 bankruptcy proceedings.

If a plaintiff seeks to remand a claim removed under 28 U.S.C. § 1452(a), then subsection (b) of that section applies. This subsection provides that

[t]he court to which [a claim or cause of action related to a bankruptcy case] is removed may remand such claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision not to remand, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title.

We have jurisdiction over this case pursuant to 28 U.S.C. § 1291. Therefore, we may not review the district court's decision not to remand.

### III

The Doddys next contend that the district court erroneously denied their second motion to remand, which they filed after the court granted Western summary judgment. The Doddys aver that the dismissal of Western from the case divested the district court of subject matter jurisdiction, and thus the court was required to remand. We determine that the district court had discretion whether to retain jurisdiction over the Doddys' pendent state claims, and review its decision not to remand for abuse of discretion. *Rosado v. Wyman,* 397 U.S. 397, 401, 90 S.Ct. 1207, 1212, 25 L.Ed.2d 442 (1970).[3]

The Doddys' contention that the district court automatically lost subject matter jurisdiction

---

[3]The defendants argue that the Doddys' second motion to remand is as unreviewable as the first. At first blush, this contention seems to have some merit. 28 U.S.C. § 1452(b) clearly provides that, once a claim is removed under § 1452, then a decision to remand or not to remand may not be reviewed. For instance, numerous courts have held that a decision to remand a bankruptcy-related case to state court because of lack of subject-matter jurisdiction (or other grounds) is not appealable. *See, e.g., In re Rayburn Enterprises,* 781 F.2d 501, 502 (5th Cir.1986) (ruling that this court could not entertain appeal where district court remanded bankruptcy-related case on grounds of lack of federal jurisdiction and abstention); *In re Compton,* 711 F.2d 626, 627 (5th Cir.1983) (holding that this court is not empowered to review district court's order remanding bankruptcy-related case on grounds of lack of jurisdiction over marital status of debtor).

However, the analysis is different where, as here, the district court declines to remand a bankruptcy-related case *after it ceases being a bankruptcy-related case.* At this point, the court's remand authority switches from that under § 1452 to that under § 1367. *Cf. Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 354 n. 11, 108 S.Ct. 614, 621 n. 11, 98 L.Ed.2d 720 (1988) (stating that "the remand authority conferred by the removal statute and the remand authority conferred by the doctrine of pendent jurisdiction overlap not at all."); *Hook v. Morrison Milling Co.,* 38 F.3d 776, 780 (5th Cir.1994) (noting that we may review court's decision to remand pendent state claims). Here, the district court had discretion to retain supplemental jurisdiction over the Doddys' tort claims or remand them. 28 U.S.C. § 1367; *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Because the court had such discretion, its decision not to remand is subject to review on appeal.

over the case when the bankruptcy-related claims dropped out before trial is in error. *See Freeport-McMoRan, Inc. v. K N Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 860, 112 L.Ed.2d 951 (1991) (noting that "[w]e have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events"). The court had discretion whether to keep the Doddys' claims. It was certainly not *required* to remand under 28 U.S.C. § 1447(c).[4] *See Carnegie-Mellon,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7 (noting that in the "usual case," the court will dismiss pendent claims at the same time it dismisses federal ones, but that this is not a "mandatory rule to be applied inflexibly in all cases"); *Newport Limited v. Sears, Roebuck and Co.,* 941 F.2d 302, 307 (5th Cir.1991) (ruling that, while it is appropriate in many instances for a court to dismiss pendent state claims at the same time it dismisses federal claims, such dismissal is neither "absolute nor automatic"), *cert. denied,* 502 U.S. 1096, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992).

The Supreme Court has instructed that, when dealing with motions to remand pendent claims, courts should exercise their discretion in a way that best serves the principles of economy, convenience, fairness, and comity. *Carnegie-Mellon,* 484 U.S. at 357, 108 S.Ct. at 623. It has noted, for example, that when a federal-law claim is "eliminated at an early stage of the litigation, the District Court ha[s] a powerful reason to choose not to continue to exercise jurisdiction." *Id.* at 351, 108 S.Ct. at 619. However, no single factor is dispositive. *Parker & Parsley Petroleum Co. v. Dresser Industries,* 972 F.2d 580, 587 (5th Cir.1992).

Here, by the time the Doddys filed their second motion to remand, this lawsuit had been in litigation for more than two years, the trial date was less than a month away, the parties had already

---

[4] 28 U.S.C. § 1447(c) states that "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."

The Doddys cite *Hexamer v. Foreness,* 981 F.2d 821 (5th Cir.1993), for the proposition that "[t]he plain language of section 1447(c) requires the district court to remand the case when it finds that subject matter jurisdiction is lacking." *Id.* at 824. In that case, though, we had previously held that the district court *never* had subject matter jurisdiction over the plaintiff's claims. In contrast, here the court *always* had subject matter jurisdiction over the Doddys' claims, first by virtue of 28 U.S.C. § 1334 and then through it decision to retain jurisdiction over the Doddys' state-law claims under 28 U.S.C. § 1367. Moreover, § 1447(c) cannot be read to overrule the repeatedly expressed view that changes after removal cannot eliminate jurisdiction and require remand. *In re Shell Oil Co.,* 966 F.2d 1130, 1133 (7th Cir.1992).

filed more than 300 pleadings, most of the parties had already prepared extensive discovery disclosures in accordance with the Federal Rules of Civil Procedure, and summary judgment motions on behalf of many of the remaining defendants were pending. Moreover, the Doddys' remaining causes of action did not raise any novel or unsettled issues of state law; their claims could be readily decided in federal court under established Texas tort principles.[5] We are satisfied that the district court did not abuse its discretion in declining to remand.

IV

The Doddys next challenge Judge Harmon's decision to vacate her order recusing herself. They do not argue that the judge *should* have recused herself. Rather, they assert that she could not take any actions after she had recused herself, other than the purely ministerial one of transferring the case to another judge. We agree. However, we find that Judge Harmon's erroneous decision to vacate her recusal order was harmless.

The issue of whether a judge can vacate her own recusal order is one of first impression in this circuit.[6] Indeed, only one other appellate court has dealt squarely with this question. In *El Fenix*

---

[5]The Doddys originally asserted claims for strict liability for engaging in an abnormally dangerous activity. Because the Texas Supreme Court has not expressly ruled on the existence of such strict liability, it might well be considered an "unsettled" point of law (this is discussed in more detail below).

> However, the district court determined that Texas did not recognize the abnormally dangerous strict liability tort and dismissed the Doddys' strict liability claims more than a month *before* they filed their second motion to remand. Therefore, at the time the court decided the second remand motion, the Doddys' claims did not include any that involved a novel or unsettled area of state law.

[6]This is not a situation where a judge merely raises the issue of recusal, and later makes a formal ruling not to recuse herself. *See In re Lieb,* 112 B.R. 830, 833-34 (Bankr.W.D.Tex.1990) (offering example of such a circumstance). Here, Judge Harmon entered an order of recusal, and the case was actually assigned to another judge. She then vacated the recusal order, conducted a hearing to determine if there was a factual basis for recusal under § 455(b), and requested the chief judge to appoint a disinterested judge to determine if there was a reason for recusal under § 455(a).

> 28 U.S.C. § 455(a) provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Section 455(b) then provides a number of specific circumstances in which the judge "shall also disqualify himself," including the situation where a judge knows that he has "an interest that could be substantially affected by the outcome of the proceeding...."

*de Puerto Rico v. The M/Y Johanny,* 36 F.3d 136 (1st Cir.1994), the district court judge, for the sole reason that his impartiality had been questioned, recused himself and vacated his previous judgment in a bench trial. After the defendant moved for reconsideration of this order, the judge vacated his recusal order and reinstated the judgment.

The First Circuit found that nothing in the district court record provided sufficient grounds for recusal. However, it still determined that the judge improperly reconsidered and set aside his recusal order. The court noted the general rule that a trial judge who has recused himself "should take no other action in the case except the necessary ministerial acts to have the case transferred to another judge." *Id.* at 141. It then stated that

> although it may be arguable that this reasoning does not control the distinct question whether an improvident recusal order may be revisited by the recused judge absent a proper waiver under subsection 455(e), we are aware of no authority for such a position. Therefore, we consider it the better part of discretion, for now at least, not to blur the reasonably clear line traced by the extant case law.

*Id.* at 141-42. In a footnote, the court noted that the values underlying 28 U.S.C. § 455(a) "weigh heavily in our decision." *Id.* at 142 n. 7. These include protecting the litigants' constitutional entitlement to an unbiased adjudication and the public's perception of the integrity of the judicial process.

As the First Circuit implied, as a general matter, courts have almost uniformly held that a trial judge who has recused himself should take no other action in the case except the necessary ministerial acts to have the case transferred to another judge. 13A CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3550, at 629 (2d ed.1984); *see also Moody v. Simmons,* 858 F.2d 137, 143 (3d Cir.1988) (holding that once a judge has disqualified himself, he may only perform the ministerial duties necessary to transfer case to another judge and may not enter any further orders in the case, except for "housekeeping" ones), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 835 (1989); *Arnold v. Eastern Air Lines, Inc.,* 712 F.2d 899, 904 (4th Cir.1983) ("Patently a judge who is disqualified from acting must not be able to affect the determination of any cause from which he is barred."), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984); *In re Cement Antitrust Litigation,* 673 F.2d 1020, 1025 (9th Cir.1982)

(noting that disqualified judge may perform "ministerial duties such as assigning a case to another judge"); *Rohrbach v. AT & T Nassau Metals Corp.,* 915 F.Supp. 712, 716 & n. 5 (M.D.Pa.1996) ("As a general rule, a trial judge who has recused himself "should take no other action in the case except the necessary ministerial acts to have the case transferred to another judge.' "); *Whitehead v. Nevada Commission on Judicial Discipline,* 920 P.2d 491, 502-03 (Nev.1996) (collecting state cases).

As contrary authority, the defendants can point only to a footnote in *Stringer v. United States,* 233 F.2d 947, 948 (9th Cir.1956). This footnote is appended to a sentence in the text that reads, "This is not to suggest that a trial judge after disqualifying himself cannot with propriety carry on the mechanical duties of transferring the case to another judge or other essential ministerial duties short of adjudication." *Id.* The footnote then opines that "[t]here may be *other* instances where a judge disqualifying himself could resume direction or even decide the issues. For instance, he might be mistaken as to the identity of a party. But the reason for resuming control should be more than a second reflection on the same facts which the trial judge considered originally disqualified him." *Id.* at 948 n. 2 (emphasis added).

We doubt the value of this footnote. First, it cites no authority for its conclusion. Indeed, it seems to conflict with the overwhelming body of case law that suggests that judges can do nothing after recusal other than transfer their case to another judge. Second, it does not refer to the policies underlying § 455. Surely, it would be improper for a judge to decide the issues of a case in which he had recused himself if this decision violated the litigant's constitutional right to be heard by a "neutral and detached" judge or undermined the public's confidence in the impartiality of the judicial process. *See Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 858 n. 7 & 861, 108 S.Ct. 2194, 2201 n. 7, 100 L.Ed.2d 855 (1988) (noting that a judge is called upon "to take the steps necessary to maintain public confidence in the impartiality of the judiciary"); *Ward v. Monroeville,* 409 U.S. 57, 62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972) (stating that due process guarantees litigants a "neutral and detached judge in the first instance").

We are reluctant to disturb the generally consistent line of cases that have held that a judge

may do nothing in a case after recusing himself except the necessary ministerial acts of transferring it to another judge, and carve out a special exception in this matter. Therefore, we believe it was error for Judge Harmon to have vacated her earlier order of recusal.[7]

While Judge Harmon violated the rule against post-recusal adjudication, we will not automatically vacate her post-recusal orders and remand for assignment to a different district court judge. The "harmless error" rules applies here, just as it does with regard to § 455 violations. *See Liljeberg,* 486 U.S. at 862, 108 S.Ct. at 2203 (noting that "there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance"); *In re Continental Airlines Corp.,* 901 F.2d 1259, 1263 (5th Cir.1990) (ruling that "the "harmless error' rule applies to a breach of a judge's duty to stand recused under § 455(a)"), *cert. denied,* 506 U.S. 828, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992). To determine whether reversal is warranted, we examine several factors: the risk of injustice to the parties in this case, the risk that denying this relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. *Liljeberg,* 486 U.S. at 864, 108 S.Ct. at 2205; *In re Continental Airlines Corp.,* 901 F.2d

---

[7]After vacating her recusal order, the judge scheduled and presided over a hearing to determine the relationship of Nalco and Exxon. While Nalco presented evidence indicating that this litigation would neither affect Exxon nor the independent entity that was the fruit of the Nalco-Exxon joint venture, the judge did not make any decisions in that regard. Rather, she referred the recusal issue to the chief judge to appoint a disinterested judge to decide it.

The chief judge appointed himself to resolve the issue. He examined the briefs of the parties, an affidavit, and a transcript of the hearing, and found that "there is no appearance of impropriety or other basis for recusal."

There was some confusion below about whether the judge herself could make the decision to recuse or whether she had to refer this issue to a disinterested judge (Judge Harmon did both). However, while it was prudent for the judge to direct this issue to the chief judge, she was not *required* to do so. If the issue of the judge recusing herself arises (either through a motion to recuse under § 455, an affidavit of prejudice under 28 U.S.C. § 144, or the judge's own motion), the judge may—at her option—transfer the matter to another judge for decision or determine it herself. WRIGHT, MILLER & COOPER, *supra,* § 3550, at 629; *see also Levitt v. University of Texas at El Paso,* 847 F.2d 221, 225 (5th Cir.), *cert. denied,* 488 U.S. 984, 109 S.Ct. 536, 102 L.Ed.2d 567 (1988) (citing WRIGHT, MILLER & COOPER, *supra,* § 3550); *In re Corrugated Container Antitrust Litigation,* 614 F.2d 958, 963 n. 9 (5th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980) (noting that no authority "suggests any negative inference that can be drawn from the fact that the judge to whom a motion to recuse is directed rules on the motion" instead of referring it to another judge).

at 1263.

No risk of injustice to the parties exists here. Judge Harmon's recusal was *sua sponte,* and based on incomplete and incorrect information. There is no evidence that the judge had any particular interest in the outcome of the case or that she appeared partial to either side. Moreover, none of the parties ever moved to have the judge step aside, and none has suggested any actual bias or prejudice. Indeed, a disinterested judge has already looked into the matter and concluded that there was no reason for the judge to recuse herself. Because the Doddys have suffered no prejudice from Judge Harmon's reversal of her recusal order, allowing her post-recusal orders to stand will not lead to injustice.

Our decision here is also unlikely to produce injustice in other cases. Situations where judges *sua sponte* recuse themselves and then vacate their orders are uncommon. We rather doubt that a judge will be inclined to construe this opinion as a license to make such circumstances more frequent.

Lastly, there is no risk of undermining the public's confidence in the judicial process. Indeed, overturning the many decisions Judge Harmon made after vacating her recusal order—simply because she recused herself too hastily and in error—would be wasteful and unnecessary. Accordingly, we hold that Judge Harmon's error in reversing her recusal order was harmless.

V

Next, the Doddys maintain that the district court wrongly struck parts of the amended affidavit of T.B. Cotton, whom they presented both as a lay witness and expert witness.[8] We determine that the issue on appeal is the admissibility of Cotton's testimony under Rule 701 of the Federal Rules of Evidence, and review the district court's decision for abuse of discretion. *Robinson v. Bump,* 894 F.2d 758, 762 (5th Cir.), *cert. denied,* 498 U.S. 823, 111 S.Ct. 73, 112 L.Ed.2d 46 (1990); *Scheib v. Williams-McWilliams Co.,* 628 F.2d 509, 511 (5th Cir.1980).

The court stated that Cotton's dual status as both a lay and expert witness "does not give him license to testify to matters either beyond his expertise or of which he has no personal knowledge."

---

[8]There was some uncertainty below as to whether Cotton was an expert witness, lay witness, or both. After the court asked the Doddys to clarify Cotton's status, they stated that he was both.

It found that

> [a]lthough Cotton is qualified to testify as an expert with respect to the procedures for treating oil and gas wells for corrosion, ... Cotton is not qualified to testify on issues related to chemical content, toxicity, migration of chemicals through the East Texas Oil Field, and the effects that activities in the East Texas Oil Field have on the McKinley "E" Lease Well No. 14. To permit otherwise would tend to mislead the jury by having an "expert' testify to matters that are not within his field.

The court then struck the parts of Cotton's affidavit that dealt with matters on which it deemed he was not qualified to testify.

On appeal, the Doddys claim that Cotton's testimony about "toxic chemicals and other toxic substances" being used at the well and elsewhere in the East Texas Oil Field was from his personal knowledge, and thus should not have been stricken. The Doddys do not challenge the court's determination that Cotton was not qualified to testify as an expert. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (noting that experts, unlike ordinary witnesses, are permitted to offer opinions not based on first-hand knowledge or observation). Rather, they only assert that the portions of the Cotton affidavit dealing with toxic chemicals being used at the well and elsewhere in the oil field were admissible lay testimony and hence should have been considered by the court.

Rule 701 provides that a non-expert witness may testify in the form of opinions or inferences only when they are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Rule 701 only applies "[i]f the witness is not testifying as an expert...." FED. R. EVID. 701. In other words, a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person. *Brady v. Chemical Const. Corp.,* 740 F.2d 195, 200 (2d Cir.1984). Here, the Doddys claim that Cotton, in his affidavit, asserts personal knowledge of "toxic chemicals and other toxic substances" "contaminat[ing]" the well and other parts of the East Texas Oil Field. However, as the district court found, Cotton lacks any expertise in petroleum engineering, chemistry, or biology. Thus, it is rather doubtful that, in the absence of any specialized training or experience in these areas, he—or any other ordinary person—could have personal knowledge about the toxicity of chemicals or substances (such as

benzene) at the well or elsewhere. Therefore, we cannot say that the district court abused its discretion in striking parts of Cotton's testimony as a "fact witness."

VI

The Doddys allege that the district court erred in granting Occidental's second motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. We review *de novo* a district court's granting of a motion to dismiss for lack of personal jurisdiction. *Jobe v. ATR Marketing, Inc.,* 87 F.3d 751, 753 (5th Cir.1996).

Occidental moved to dismiss the Doddys' claims against it for lack of personal jurisdiction. The court granted the motion, noting that, over the past year, the Doddys had failed to show such jurisdiction. After the Doddys moved for reconsideration, though, the court decided to give them additional time to perform discovery on the personal jurisdiction issue, and vacated the motion to dismiss.

Six months later, Occidental filed another motion to dismiss for lack of personal jurisdiction. Occidental alleged that the Doddys had still not been able to show that the court had personal jurisdiction over it. The Doddys responded by asserting that Occidental had refused to cooperate in discovery. The court granted the motion.

When a nonresident defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the district court's jurisdiction over the defendant. *Wilson v. Belin,* 20 F.3d 644, 649 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994). Where the court decides a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff may satisfy his burden by presenting a *prima facie* case for jurisdiction. *Felch v. Transportes Lar-Mex Sa De Cv,* 92 F.3d 320, 326 (5th Cir.1996). Otherwise, the court may determine the jurisdictional issue by examining affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery. *Colwell Realty Investments v. Triple T. Inns of Arizona,* 785 F.2d 1330, 1333 (5th Cir.1986).

Here, the Doddys had almost two years to conduct discovery to determine whether Occidental had any relevant contacts with Texas. However, the record indicates that the Doddys failed to take

reasonable and timely steps to acquire the information they needed, either from Occidental or elsewhere. Thus, the Doddys did not meet their burden of showing personal jurisdiction, and the district court properly dismissed Occidental from the case.

VII

The Doddys claim that the district court wrongly granted summary judgment on their claims that the defendants were strictly liable for engaging in abnormally dangerous activities. In addition, they allege that the district court erred in granting summary judgment for various defendants, namely, Central, Trident, Petrolite, Baker, Halliburton, Pool, Nalco, Bolt, Pride, Ancor, and Oxy.

We review a district court's grant of summary judgment *de novo*. *New York Life Ins. Co. v. The Travelers Ins. Co.,* 92 F.3d 336, 338 (5th Cir.1996). In doing so, we employ the same criteria as the district court, and construe all facts and inferences in the light most favorable to the non-moving party. *LeJeune v. Shell Oil Co.,* 950 F.2d 267, 268 (5th Cir.1992). Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

A

While the Doddys apparently concede that the lower Texas courts have not recognized strict

liability for abnormally dangerous activities,[9] they assert that the district court erred by assuming that the Texas Supreme Court has explicitly refused to adopt such a tort. Moreover, they speculate that, if squarely faced with this question, the supreme court would permit them to pursue their abnormally dangerous strict liability claims.

Under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court applying state law must decide how the state supreme court would rule if faced with the particular facts of the case. *Hanley v. Forester,* 903 F.2d 1030, 1032 (5th Cir.1990). We review *de novo* a district court's determination of state law. *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

Courts often cite *Turner v. Big Lake Oil Co.,* 128 Tex. 155, 96 S.W.2d 221 (1936), for the proposition that the Texas Supreme Court has rejected strict liability for abnormally dangerous activities. *See, e.g., Hall v. Amoco Oil Co.,* 617 F.Supp. 111, 112 (S.D.Tex.1984) (citing *Turner* as rejecting this tort). In *Turner,* the Texas Supreme Court faced the question of whether to impose strict liability for damages resulting from the escape of saltwater from ponds constructed to store runoff from oil wells. In doing so, it declined to follow the landmark English case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868). *Rylands* established the doctrine of strict liability for property owners for the "non-natural" (i.e., extraordinary, exceptional, or abnormal) use of their land.[10] It was also the basis for the development of the modern abnormally dangerous activity doctrine, which is famously "restated" in §§ 519 and 520 of the Restatement (Second) of Torts.[11] *See* KEETON, *supra,*

---

[9]The Doddys argue that the Texas Court of Appeals recognizes strict liability for abnormally dangerous activities as long as it is accompanied by proof of negligence. Needless to say, though, strict liability that requires proof of negligence is not strict liability.

[10]*See* W.PAGE KEETON, PROSSER & KEETON ON THE LAW OF TORTS 546 (5th ed.1984).

[11]Section 519 of the second Restatement provides the general rule for liability for engaging in an abnormally dangerous activity. It states:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

at 544-54.

It is somewhat unclear whether *Turner* can be read broadly to reject strict liability for abnormally dangerous activities. For one thing, *Turner* relied heavily on an earlier case, *Gulf, C. & S.F. Ry. Co. v. Oakes,* 94 Tex. 155, 58 S.W. 999 (1900), which involved the spread of the defendant's Bermuda grass to the plaintiff's land. It is doubtful that the escape of (apparently oil-contaminated) saltwater or the spread of Bermuda grass are "abnormally dangerous," at least as contemplated by the classic formulation in § 520 of the second Restatement of Torts.[12]

However, an examination of *Turner* and *Gulf* in the context of other Texas Supreme Court opinions suggests that, in fact, the court *has* rejected the abnormally dangerous strict liability tort. In *Galveston, H. & S.A. Ry. Co. v. Currie,* 100 Tex. 136, 96 S.W. 1073 (1906), for instance, the

---

Section 520 then provides guidance on what an "abnormally dangerous" activity actually is. It states:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

[12]Discussing *Turner* and *Gulf,* this court has stated that

[w]ithout doubt the Supreme Court of Texas has refused to follow the strict rule announced in *Fletcher v. Rylands* ..., and has announced the rule, in cases where *substances that are harmless and unobnoxious within themselves* are stored or impounded upon one's land, no liability would follow for damages claimed for the escape, overflow, or seepage of such substances in the absence of an allegation and proof of negligence in the storage, keeping, or impounding thereof.

*King v. Columbian Carbon Co.,* 152 F.2d 636, 639-40 (5th Cir.1945) (emphasis added). Moreover, this court has characterized the Texas Supreme Court's holding in *Turner* as repudiating the *Rylands* "doctrine of strict liability for damages from impounded waters." *Ford Motor Co. v. Dallas Power & Light Co.,* 499 F.2d 400, 408 (5th Cir. 1974).

court raised the question whether the introduction of compressed air into a railroad roundhouse was so dangerous that a person of ordinary prudence using it would have adopted special precautions to prevent injury to others. The court noted that while "[s]ome of the older cases in England seem to assert the absolute liability of an insurer, ... it is settled in this state that the question is one of negligence." *Id.* 96 S.W. at 1077 (citing *Gulf,* 58 S.W. 999). In *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121 (1950), the court applied negligence principles in the context of the use of explosives. *Id.* at 122. Lastly, in *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558 (1948), the court suggested that with regard to "the nature of oil and gas and t he risks involved in their production [such as the possibility of an oil well "blowout"]," "[i]n the conduct of one's business or in the use and exploitation of one's property, the law imposes upon all persons the duty to exercise ordinary care to avoid injury or damage to the property of others." *Id.* 210 S.W.2d at 584.[13]

We determine, then, that the Texas Supreme Court has clearly rejected strict liability for abnormally dangerous activities. Moreover, we do not believe that the court would adopt such a tort in this case. *See Jackson v. Johns-Manville Sales Corp.,* 781 F.2d 394, 396-98 (5th Cir.1986) (en banc), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986) (stating that our task under *Erie* is to apply existing state law, not to adopt innovative theories for the state); *Pittman v. Dow Jones & Company, Inc.,* 834 F.2d 1171, 1171 (5th Cir.1987) ("[W]e are not free to fashion new theories of recovery under Louisiana law."). Therefore, we affirm the district court's grant of summary judgment on this ground.

B

The Doddys next aver that the district court erred in granting Central's motion for summary

---

[13]We also note that the lower state courts have consistently refused to create strict liability for abnormally dangerous activities. *Barras v. Monsanto Co.,* 831 S.W.2d 859, 865 (Tex.App.1992); *Robertson v. Grogan Investment Co.,* 710 S.W.2d 678, 679-80 (Tex.App.1986); *Day & Zimmermann v. Strickland,* 483 S.W.2d 541, 548 (Tex.Civ.App.1972); *Roskey v. Gulf Oil Corp.,* 387 S.W.2d 915, 919 (Tex.Civ.App.1965); *Klostermann v. Houston Geophysical Co.,* 315 S.W.2d 664, 665 (Tex.Civ.App.); *Dellinger v. Skelly Oil Co.,* 236 S.W.2d 675, 677 (Tex.Civ.App.1951); *Stanolind Oil & Gas Co. v. Lambert,* 222 S.W.2d 125, 126 (Tex.Civ.App.1949). As the Texas Court of Appeals held in *Barras,* for example, "our courts have rejected the doctrine of abnormally dangerous activities as a basis for strict liability. In the absence of some other showing, such as negligence, there is no basis for recovery." *Barras,* 831 S.W.2d at 865 (citations omitted).

judgment. They maintain that the court wrongly relied on testimony in an affidavit discussing Central's acquisition of its predecessor's assets but not its liabilities because this document lacked an accompanying contract of sale evidencing the acquisition.

In support of its summary judgment motion, Central submitted an affidavit by its president stating that Central had had no dealings with the Doddys, but had simply acquired the assets, but not the liabilities, of the company that did. The Doddys assert that Central violated Rule 56(e) of the Federal Rules of Civil Procedure by failing to attach the pertinent contract of sale to the affidavit. Rule 56(e) requires that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."

An examination of the affidavit reveals that it does not refer to a contract of sale, or any other papers or parts thereof. Rather, the affidavit merely asserts that Central's president has personal knowledge of the sale in which Central purchased the assets of its predecessor but did not assume the liabilities. Thus, we reject the Doddys' contention as without merit.

C

The Doddys also challenge the court's grant of summary judgment to Petrolite, Baker, Halliburton, Pool, Nalco, Bolt, Pride, and Ancor. The Doddys argue that the court erroneously concluded that they failed to offer any evidence indicating that these defendants were the cause in fact of their injuries, and that the record "viewed as a whole" reveals genuine issues of material fact.

To prove a claim of negligence, the plaintiff must show that the defendant's negligent conduct proximately caused his injuries. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987). Proximate cause consists of cause in fact and foreseeability. *Exxon v. Quinn,* 726 S.W.2d 17, 21 (Tex.1987). Cause in fact means that the negligent act or omission was a substantial factor in bringing about the injury and without which no harm would have been incurred. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985). The plaintiff must prove that it is more probable than not that, but for the defendant's conduct, the alleged damages would not have occurred. *El Chico,* 732 S.W.2d at 313.

In opposing the summary judgment motions, the only evidence to which the Doddys alluded

was the Cotton affidavit. However, the district court considered more than this affidavit (or at least its unstricken portions) in ruling on the summary judgment motions. It also reviewed reports by John Sexton of McDowell Owens Engineering and Cannon Environmental Services ("Cannon"). On appeal, the Doddys ask us to examine the Cannon report, the Cotton affidavit, the report of Frank M. Parker of Environmental Technologies, Inc., and the report of Dr. William J. Rea.[14]

Rule 56 does not impose a duty on the district court to sift through the record in search of evidence to support a party's opposition to summary judgment. *Jones v. Sheehan, Young & Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir.1996) (citations omitted). The district court had no obligation to consider evidence that the Doddys did not bring forth in opposition to the summary judgment motions. *Copsey v. Swearingen,* 36 F.3d 1336, 1347 n. 9 (5th Cir.1994). And we have no obligation to do so here on appeal. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

Out of an abundance of caution, though, we have examined the proof to which the Doddys have referred. *See Jones,* 82 F.3d at 1338 n. 3 ("Like the district court, out of an abundance of caution, we have searched the record for support for Jones' complaints.") None of the evidence in the record to which the Doddys allude indicates that any of the particular defendants seeking summary judgment was the cause in fact of the Doddys' alleged injuries. Indeed, the Canon report even explicitly states that it does not "pinpoint" the source of the elements found in and around the Doddys' home. On this slim proof, no reasonable jury could find in favor of the Doddy's claims against these defendants.

D

---

[14]Cannon monitored the air inside and outside of the Doddys' residence. It detected benzene outside the home and benzene and related elements inside. It concluded, though, that this "does not pinpoint the emission source of the volatiles." In his report, Parker opines that "[t]o construct these homes [i.e., those in the Doddys' subdivision] without adequate remediation ... constituted a conscious disregard for the health of the subdivision residence [sic]." He bases this conclusion on the fact that Cannon found "aromatic hydrocarbons" (such as benzene) in and around the Doddys' home, aromatic hydrocarbons are associated with oil and gas production, and aromatic hydrocarbons can affect the central nervous system and the blood-forming organs as well as cause cancer. Rea offers a medical opinion that "in all medical probability the patients [sic] medical problems are related to the toxic chemical exposures they have encountered."

The Doddys ask us to reverse the district court's grant of summary judgment to Oxy, the current owner and operator of the well. They claim that the district court wrongly based summary judgment on the mere testimony of an Oxy employee that Oxy had acted with ordinary care.

Oxy moved for summary judgment on the basis that the evidence failed to show that it owed the Doddys the legal duty alleged in the complaint or, assuming such a duty existed, that Oxy had breached it. In support of its motion, an Oxy employee submitted an affidavit stating that Oxy has acted with ordinary care in operating the well, and that all the operations performed on the well were necessary and reasonable under the circumstances.

The Doddys submitted a five-and-a-half page brief (with no attached exhibits) responding to the summary judgment motion filed by Oxy as well as those filed by Petrolite, Baker, Halliburton, Pool, Nalco, Bolt, Pride, and Ancor. This brief reveals no discussion of Oxy's motion at all. It does not even attempt to contest the assertions in Oxy's affidavit.

A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. FED. R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. The Doddys failed to challenge Oxy's evidence that it did not breach any duty it may have owed to them. Therefore, there can be no genuine dispute of material fact on this question.

E

Lastly, the Doddys argue that the district court erroneously granted Trident summary judgment. They claim that the court ignored a portion of the Cotton affidavit that suggests that Trident reinjects "used saltwater" into a formation at the East Texas Oil Field (that presumably finds its way into the well), and thus a genuine dispute of material fact exists on Trident's liability.

In the Doddys' third amended complaint, they allege that Trident (among others) was an owner and operator of the well. In moving for summary judgment, Trident presented evidence that it has never been an owner or operator of the well. Other than proffering the Cotton affidavit, the Doddys do not dispute this evidence. Not only do the Doddys fail to show any evidence that their alleged injuries were caused by Trident, but they do not even present proof that Trident breached any

legal duty it owed them.  Thus, they fail to meet their burden on summary judgment here as well.

## VIII

For the foregoing reasons, we AFFIRM the judgment of the district court.